**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4485-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.K.,[1]

     Defendant-Appellant,

and

D.R.,

     Defendant.

_____

IN THE MATTER OF E.R.-K.
and Ez.R.-K.,

     Minors.

_____

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials to identify the adults and pseudonyms to identify the children to protect their privacy and preserve the confidentiality of these proceedings.

Argued October 10, 2019 – Decided July 29, 2020

Before Judges Fuentes, Haas and Mayer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FN-02-0046-17.

Carol L. Widemon, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Carol L. Widemon, on the briefs).

Monique D'Errico, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Monique D'Errico, on the brief).

Noel Christian Devlin, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Noel Christian Devlin, of counsel and on the brief).

PER CURIAM

Defendants K.K. (father) and D.R. (mother) are the biological parents of Elyssa, born in 2003, and Erik, born in 2005. On July 26, 2016, the Division of Child Protection and Permanency (Division) filed a Verified Complaint for the Care and Supervision of these two children in the Chancery Division, Family Part in Bergen County. The Division also requested that the Family Part restrain K.K. from having any contact with his children. At the time, the children were residing with D.R. in Englewood and K.K. was residing in Newark. The

Division commenced this action after it investigated Elyssa's allegations of sexual abuse against her father. On September 22, 2016, approximately four months before seeking judicial relief, the Division completed its investigation and found sufficient evidence to substantiate that K.K. sexually abused his biological daughter Elyssa when she was twelve years old.

K.K. denied the veracity of his daughter's allegations and requested a plenary hearing before the Family Part. Judge Magali M. Francois conducted a fact-finding hearing over a five-day period commencing on March 7, 2017 and ending on April 7, 2017. The Division's case against defendant consisted of the testimony of caseworker Magalena Sandoval; Licensed Clinical Social Worker (LCSW) Joanne Glaeser, who is employed by the Audrey Hepburn Children's House, located at Hackensack University Medical Center; and Elyssa herself. The Law Guardian did not present any witnesses. Defendant K.K. called D.R. as a witness, and he testified in his own defense.

Judge Francois also admitted into evidence the following documentary exhibits: the audio/video recordings of the interviews of Elyssa, D.R., and K.K. conducted by detectives from the Bergen County Prosecutor's Office (BCPO) and the Request for Dismissal of Essex County Indictment No. 13-09-2148-I,

made by the Essex County Prosecutor's Office (ECPO)[2] on May 26, 2015, which charged K.K. with three counts of first degree aggravated sexual assault, N.J.S.A. 2C:14-2a(1), and three counts of second degree endangering the welfare of a child, N.J.S.A. 2C:24-4a.

The Assistant Prosecutor who submitted the request to withdraw the pending charges against K.K. provided the following explanation to the Essex County Criminal Part Judge assigned to manage this case:

> On April 29, 2015 this office received an affidavit from [D.R.] indicating that her daughter had recently disclosed to her that she had fabricated the charges against her father [K.K.] She further indicated that her daughter told her that she had learned the details from her half-sister about [K.K.'s] prior conviction and placement on Megan's Law [s]upervision. She indicated that she did this because she was mad at her father for being excessively strict with her. Based on this affidavit both [D.R.] and her daughter were brought into the prosecutor's office and re-interviewed. The victim reiterated that she had fabricated the charges and had used details garnered from her step-sister to make these charges. [D.R.] also gave a sworn statement indicating that she has not been in contact with defendant and that he has not influenced the daughter.
>
> This case relies solely on the testimony of the daughter and while recantations are not uncommon with child victims the victim in this case has been adamant that

---

[2]  For reasons not made clear in the record, Essex County was selected as the venue for the prosecution of these criminal charges against K.K.  The only rational explanation is that the BCPO and ECPO reached an agreement pursuant to Rule 3:14-1(a).

4

these are false charges. Without any additional corroboration the State will be unable to meet its burden and therefore I respectfully request that these charges be dismissed.

After carefully reviewing the evidence presented by the parties, Judge Francois found the Division proved, by a preponderance of the evidence, that K.K. sexually abused Elyssa when she was twelve years old. The judge found this incestuous sexual assault by her biological father caused Elyssa great emotional trauma. Judge Francois accepted the opinion of the mental health professional, who testified at the fact-finding hearing, that Elyssa suffers from adjustment disorder with anxiety and requires individual therapy. Based on these findings, Judge Francois concluded there was a legal and factual basis to continue the Division's oversight.

In this appeal, K.K. urges us to vacate the Family Part's judgment finding that he sexually molested his biological daughter and remand this matter for a new fact-finding hearing because Judge Francois denied his request to represent himself, in violation of his constitutional and statutory rights. Furthermore, K.K. argues that Judge Francois's factual findings and analysis of the evidence were improperly influenced by expert testimony that relied on Child Sexual Abuse Accommodation Syndrome (CSAAS), a psychological doctrine that our Supreme Court recently found to be scientifically unsound and inadmissible in

criminal cases.  <u>State v. J.L.G.</u>, 234 N.J. 265, 272 (2018).  K.K. claims that acceptance of either of these arguments requires that we vacate Judge Francois's findings and remand this matter for a new fact-finding hearing.

We are not persuaded by K.K.'s arguments and affirm substantially for the reasons expressed by Judge Francois in her well-reasoned memorandum of opinion.

I

The Division filed a Verified Complaint on July 26, 2016 that recited in great detail K.K.'s history of sexual abuse of his biological daughters.  The Complaint began with a referral the Division received from a healthcare professional on May 24, 1993, that alleged "two children had been brought to the emergency room because the six year old female child stated that 'Daddy [K.K.] put his finger in her private part.'"  The referral also alleges that the older, seven-year-old girl said

> that she heard the six year old child yell and it was further reported that [K.K.] told the seven year old child that if she told, he would beat her. It was noted that the family had already been discharged from the hospital. <u>The Division's online case management records database indicated that the allegations were substantiated</u>.
>
> [(Emphasis added).]

A-4485-17T3

The Complaint also included a referral the Division received on May 15, 2004 involving a domestic violence incident between K.K. and D.R. The altercation occurred in the presence of Elyssa, who was then seven months old. The Division alleged that K.K. "dragged" D.R. with such force that it caused baby Elyssa "to fall to the ground during the incident." Although Elyssa was remarkably unscathed, her mother D.R. suffered visible "scrapes and cuts." The police officers who responded to the scene "arrested and charged [K.K.] with [s]imple [a]ssault[3] and [p]roviding [f]alse [i]nformation[4] and [he] was incarcerated." Independent of the criminal offenses related to this incident, the police also arrested K.K. on an outstanding warrant "for [f]ailure to [r]egister under Megan's Law."[5]

The Division sought a temporary judicial decree for the care and supervision of Elyssa and her bother Erik. The Deputy Attorney General (DAG) appeared on behalf of the Division; the Law Guardian appeared on behalf of the

---

[3] See N.J.S.A. 2C:12-1a

[4] See N.J.S.A. 2C:29-3.

[5] Pursuant to N.J.S.A. 2C:7-2a, a person who has been convicted of one or more of the sex offenses delineated in N.J.S.A. 2C:7-2b must register with law enforcement as provided under N.J.S.A. 2C:7-2c and d. A person who fails to register as required by law "shall be guilty of a crime of the third degree." N.J.S.A. 2C:7-2a(3).

children; and an attorney assigned by the Public Defender – Office of Parental Representation (OPR) appeared on behalf of D.R., who was present in the courtroom. When Judge Francois inquired as to K.K.'s whereabouts, the DAG said that K.K. was "released from incarceration" on July 14, 2016. The Division caseworker "has reached out to him on several occasions and has not had a response. So his whereabouts are unknown at this time."

The DAG thereafter called Division caseworker Magdalena Sandoval to establish the veracity of the allegations in the complaint.

> Q. Now, the biological father of the children is [K.K.] Is that correct?
>
> A. Correct.
>
> Q. And he is not present here today, correct?
>
> A. Correct.
>
> Q. And have you tried to contact him to notify him of this hearing?
>
> A. Yes. We did call. I called him.
>
> Q. And were you able to get in touch with Mr. [K.]?
>
> A. No. I left messages for him.

The OPR counsel representing D.R. apprised the court that her client joined with the Division's application to obtain judicial restraints preventing K.K. from having any contacts with her or the children. D.R.'s counsel also

informed Judge Francois that K.K. "has been trying to reach her via telephone. He's been calling her every day. She did go to the police and advise them and it has been documented." Judge Francois made clear to D.R. that there was a restraining order in effect. The judge also placed D.R. under oath, addressed her directly, and told her: "It's important that you follow the case plan that you entered with the [Division] representatives and not allow Mr. [K] to have any contact with either [Elyssa or Erik]. Do you understand?" D.R. responded: "I understand, Your Honor."

Judge Francois found sufficient credible evidence to substantiate the issuance of restraints against K.K. The judge found that in the early morning of July 11, 2016, police officers from the Englewood Police Department responded to a domestic violence call from the home of D.R. The officers found K.K. arguing with D.R. and the children. The officers arrested K.K. for violating an active restraining order that was issued in February 2016. Although the children were present at the time, they were not physically injured.

Of particular relevance here, Judge Francois found that

> the family has a substantial and lengthy history with [the Division] due to allegations of sexual abuse by [K.K.] of [Elyssa] and his eldest daughters who are now adults which occurred approximately 10 to 20 years apart. Furthermore, there is [an] extensive history of domestic violence between [K.K.] and [D.R.] dating

back to May 20th, 2004 when [D.R.] obtained her first initial Restraining Order.

Lastly, there have been allegations of substance abuse by both parents, specifically marijuana and alcohol, and physical abuse by [K.K.] Also, in 2008, [D.R.] and the children [Elyssa and Erik] resided in a domestic violence shelter in New York City for a short period of time.

I am going to order that this matter be brought back on August the 18th at 1:00 [p.m.]

Judge Francois characterized the August 18, 2016 hearing as the "Return on the Order to Show Cause." The DAG appeared on behalf of the Division; the Law Guardian entered her appearance on behalf of the children; and the OPR counsel entered his appearance on behalf of D.R. Since the July 26, 2016 hearing, K.K. had not made any attempt to communicate with the court. Once again, the record showed K.K. did not attend this hearing nor make any effort to apply for representation by the OPR or retain private counsel.

The DAG reported to the court that "[t]he children continue in the care and supervision of the Division [and] in the physical custody of [D.R.]," who has met with the Division's domestic violence liaison. K.K. remained subject to the court's restraining order and had not contacted the Division. The DAG made the following representations to the court with respect to K.K.:

The Division has attempted to serve [K.K.] in Newark on several occasions, however, we've been

A-4485-17T3

unsuccessful. The Sheriff's Department in Bergen [County] cannot [serve] out of county so we . . . have been using the Human Service Police to try to serve him with the complaint.

The Division has attempted to contact [K.K.] via cell phone on several occasions. His phone is now disconnected.

D.R.'s counsel advised the court that in addition to the restraints imposed against K.K. in this case, D.R. filed a domestic violence complaint against K.K. and obtained a temporary restraining order (TRO). However, K.K. had not been served with the domestic violence complaint or the TRO. Judge Francois ordered psychological evaluations of the children and, at D.R.'s counsel's request, ordered that the TRO issued against K.K. in the pending domestic violence case "mirror" the restraints imposed in this case. Although the judge scheduled a case management conference on October 13, 2016 at 1:30 p.m., the court did not reconvene until November 3, 2016.

The November 3, 2016 case management conference was the first time K.K. physically appeared before the Family Part since the Division filed the verified abuse and neglect complaint on July 26, 2016. When the judge asked K.K. if he was represented by counsel, he responded: "I'm not sure of what's going on, Your Honor." The judge explained to K.K. that he needed to complete the "5A form" to determine whether he is eligible to be represented by an OPR

11

attorney. The DAG stated for the record that the Division's investigation of the sexual abuse allegations against K.K. had not been completed because his "whereabouts had been unknown." The Division needed to interview K.K. about Elyssa's allegations. BCPO detectives also planned to question K.K. later that day.

In the course of this hearing, D.R.'s counsel asked the court to restrain K.K. from having any contacts with D.R. pursuant to N.J.S.A. 9:6-8.55. The DAG and Law Guardian joined D.R.'s counsel's request for restraints and added that K.K. should also be restrained from having any contacts with the children. In response to this application, Judge Francois addressed K.K. directly as follows:

> I am also telling you today, since you're unrepresented, [K.K.], that you are going to be restrained from the home where the children are living with their mother. So you're not allowed to go there if you get released.[6] And you are also restrained from any contact with the children right now until I know what's going on from the evaluations. Okay?
>
> [(Emphasis added).]

At one point in the proceeding, the DAG advised the judge as follows:

> DAG: Judge, [K.K.] had indicated to me that he does not want to complete this application. He wants to

_____

[6] Based on the manner the judge phrased this statement, we infer K.K. was detained at the time, most likely at the Essex County Correctional Facility.

represent himself. I don't know if Your Honor wants to hear him any further.

THE COURT: I strongly advise you against that. I strongly advise you not to represent yourself. This is a very serious matter regarding your rights as a parent.

[K.K.]: Okay.

THE COURT: And I strongly advise you to fill out the form and you will be provided an attorney so that when you have questions about what's going on in the proceedings that you have someone to explain the proceedings to you, to explain what your rights are because this is a very serious matter. Okay?

[K.K.]: Okay.

THE COURT: So, please, sir, fill out the form and a determination will be made whether or not you qualify for a Public Defender. Okay?

[K.K.]: Okay, Your Honor.

THE COURT: Thank you, sir. We're going to come back for another [c]ase [m]anagement [c]onference in light of the fact that there's an ongoing investigation on December 15th, [2016] at 9:00 [a.m.]

The judge scheduled another case management conference on December 15, 2016, in large part to allow the Division to continue its ongoing investigation. K.K. did not appear at the December 15, 2016 case management conference. However, an attorney from the OPR entered an appearance on his behalf and requested the judge to reschedule the matter because the Essex

13

County Correctional Facility, where K.K. was detained at the time, had not arranged for his appearance in court. Judge Francois granted K.K.'s counsel's request and rescheduled the case management conference to December 22, 2016.

K.K. and his assigned OPR counsel were both present when the court conducted the December 22, 2016 case management hearing. Although D.R. was not present due to a scheduling conflict requiring her attendance at a domestic violence counseling session, the court accepted her attorney's request to waive her appearance. The DAG noted that all of the attorneys had received a summary of the Division's investigation which substantiated Elyssa's claim that she was sexually abused by her biological father. K.K.'s counsel acknowledged receipt of the summary of the investigation and made clear that K.K. denied the allegations and wanted to challenge the Division's conclusion at a fact-finding hearing.

K.K.'s counsel raised a number of discovery issues that needed to be addressed and resolved before the hearing. Specifically, K.K.'s OPR counsel wanted the audio/video recording of Elyssa's interview by BCPO investigators and "a copy of the [Division] file from 2013 to 2015." The DAG requested that K.K.'s counsel "provide in writing a list of all of the items that she is requesting here today." Although the record reflects some disagreement among the attorneys about certain discovery matters, there is no evidence that K.K. was

14 <span>A-4485-17T3</span>

dissatisfied with his attorney or that he wanted to represent himself at the forthcoming fact-finding hearing.

## II

The fact-finding hearing began on March 7, 2017. After the attorneys entered their appearance and indicated they were ready to proceed, K.K.'s OPR counsel informed the court that K.K. wanted to address the court directly to make an application. After the court clerk administered the oath required under N.J.R.E. 603, K.K. addressed the court as follows:

> Your Honor, with all due respect, I would like to request the recusal of . . . my advocate . . . because I believe there's been a conflict of interest in my situation whereas, one, I have not obtained my full discovery. Two, I feel the reason that she has brought to my attention a new charge that [D.R.] put against me while I was in jail and she said she couldn't do anything about that so I feel I would be inadequately represented.
>
> THE COURT: Okay. So, let me just say – let's start with the easier -- the new charge. Why would [OPR counsel] -- what new charge are you talking about?
>
> [K.K.]: I was brought -- I was brought to Central Judicial Processing where they said that [D.R.] applied new charges against me. One, breaking into her house, threatening to kill her . . . and stalking her.
>
> . . . .
>
> THE COURT: Okay. These are criminal charges, correct?

. . . .

[K.K.]: Okay. Yes, Your Honor.

The judge explained to K.K. that OPR counsel did not represent him with respect to the criminal charges, even if the criminal charges are based on the same allegations the Division has made in this abuse and neglect case. The judge further explained that the Office of the Public Defender would assign a different attorney to represent him in the criminal case. Notwithstanding the judge's explanation, K.K. stated: "Well, I don't feel that all my rights will be adequately adjudicated to the [c]ourt." When the judge asked him to explain, K.K. claimed his OPR attorney "brought discovery" about matters unknown to him and in "piecemeal."

Judge Francois asked K.K. to identify the type of discovery he claimed he did not have an opportunity to review, "[b]ecause right now you haven't said anything to me to convince me that [OPR counsel] is not ready for trial." Unable to provide a rational basis to question OPR counsel's competence or readiness to represent him in the fact-finding hearing, K.K. nonetheless told the judge: "I feel I need to . . . do this pro [se] [.]" The judge explained to K.K. that at this point in the proceedings, she would not permit him to proceed pro se. However, the judge told him that he could "supplement whatever questions you feel that your attorney hasn't asked." Undeterred by the judge's willingness to

accommodate his belated concerns, K.K. sought leave from the court to retain

private counsel:

> [K.K.]: Okay. Well, is it possible that I can have an attorney that I can feel comfortable with? Because my . . . family was seeking to get a proper attorney for me. And I don't know . . . like she repeatedly said she doesn't know me. I don't know her. And I felt uncomfortable. She made – you know, there have been times I felt uncomfortable.

Judge Francois viewed this belated request as a subterfuge by K.K. to

delay the hearing.  His history with the Division showed he did not have the

financial means to retain private counsel.

> THE COURT: Sir, you know what? I . . . almost feel like you're trying to prolong this longer than it needs to be.
>
> [K.K.]: No, Your Honor. I'm not.
>
> THE COURT: Yes. Because this is not the first time that you've appeared before me and this case has been pending for a very long time and there needs to be some sort of resolution of this matter.
>
> You want to have your hearing. You're entitled to it. I am going to give it to you. But you're not going to advise the [c]ourt as to how it's going to conduct these hearings.
>
> And, frankly, you qualified for a Public Defender. They appointed someone who is more than qualified. More than qualified to represent you in these matters because [OPR counsel] does this on a regular basis.

17

Now, if she was frank with you I don't know. You don't . . . disclose to me nor am I entitled to know what the two of you have discussed, so I'm not going to ask you. But to say that she's not qualified to do this trial, I disagree with you.

This exchange between K.K. and the judge continued for several more pages throughout the transcript without resolution. K.K. finally asked the judge if he could represent himself. This prompted the following colloquy:

THE COURT: -- you can represent yourself pro se. I strongly suggest that you not represent yourself pro se. And I can still have [OPR counsel] sit here to help you through the trial if you wish to take over as lead counsel which I don't think is a good idea.

[K.K.]: I reserve all . . . my unalienable rights, Your Honor.

THE COURT: I'm sorry?

[K.K.]: I'd like to reserve all my unalienable rights.

THE COURT: What does that mean?

[K.K.]: Right to confrontation. The right to proper –

THE COURT: You have those -- you have that right. I agree. You do have that right. Now, the way –

[K.K.]: The right to private counsel.

Once again, the judge explained in great detail the role of the OPR counsel, as licensed attorney, which included the formulation of questions to witnesses to ensure adherence to the rules of evidence and judicial decorum;

18

K.K. could suggest OPR counsel ask additional questions by writing them on a piece of paper and showing it to her. The record shows that at the end of this exchange, the DAG expressed her concerns that K.K. intended to raise his conflict of interest claims as a potential basis for appeal. After a brief recess, the judge again addressed K.K. directly with respect to his desire to represent himself:

> THE COURT: The [c]ourt has just told you that it's not a good idea but you've said I would rather go pro se. Represent yourself, correct?
>
> [K.K.]: Yes, Your Honor.
>
> THE COURT: Because you feel that she's not going to do a good enough job and doesn't have your interests?
>
> [K.K.]: It's not that. It's . . . first of all, I have all my discovery. Second of all, my family plans to get . . . an attorney for (inaudible).
>
> THE COURT: Okay. But this is what I'm telling you. I'm not delaying this trial today.

Despite her misgivings, the judge advised K.K. that she was willing to reconsider her decision and allow him to represent himself. The judge reiterated, however, that the one thing she would not do is delay the fact-finding hearing.

> THE COURT: We're going today. This has been on the books for a long time. No prior motion had been made. I am not going to delay this trial. If you want to

19

represent yourself I'm going to relieve [OPR counsel] and you can proceed with the trial representing yourself.

[K.K.]: Or a proper attorney that I feel comfortable and adequate with because I have that right.

THE COURT: You don't get to pick and choose your Public Defender. Okay?

[K.K.]: Right. But my biggest thing is getting me a lawyer.

THE COURT: You are appointed . . . a Public Defender and [OPR counsel] has been representing you since the beginning of this case when she was appointed by the Public Defender's office. But you're not going to tell me which Public Defender you're going to use. So you have –

. . . .

If I . . . may finish my thought? You have [OPR counsel] who's been appointed to represent you through the Public Defender's Office. If you don't want [OPR counsel], that's fine. And you want to represent yourself, that's fine. But those are your two choices because we're going to have a trial today.

What do you want to do, sir? If you want to go pro se as you indicated you wish to do we can go pro se. You can represent yourself.

K.K. continued his defiance by engaging the judge in a nonsensical discussion about the meaning of the term pro se. This combative exchange

20

reached its climax when the court directed K.K. to provide a clear answer to the following question:

> THE COURT: No. No. I'm not going to delay this trial. You have [an] adequate attorney because [OPR counsel] is here. So you have an attorney. You have an attorney through the Public Defender's office. You're not going to pick and choose and delay this trial. So this is -- I told you. Those are your two choices.
>
> Do you want [OPR counsel] to stay on and represent you or in the alternative, as you indicated earlier, you wanted to represent yourself? You're entitled to do that. So which one will it be?
>
> [K.K.]: It's . . . clear, Your Honor, I don't know everything, but I do know where I do need assistance. And the fact of the matter is I would like to obtain a lawyer I feel comfortable with without the feel of what I've experienced already.
>
> THE COURT: That's not an option, because you're not delaying this case anymore.
>
> [K.K.]: I'm not trying to delay the case. I just feel I need adequate representation.
>
>     . . . .
>
> THE COURT: Those are your two choices. You want to represent yourself you are entitled to do that. You want an attorney. You have one that's been representing you throughout the pendency of this case. You knew about this trial. I'm not delaying the trial. Everybody is here. The child was actually here yesterday but through no fault of your own you were not produced.
>
> [K.K.]: Okay. Proceed, Your Honor.

21

At the conclusion of this exhaustive exchange, Judge Francois made the following findings:

> THE COURT: I think I've made it crystal-clear that the defendant father indicated that he was going to proceed with [OPR counsel] representing him because the defendant father is not going to pick and choose who from the Public Defender's Office he's going to have represent him.
>
> If he doesn't want [OPR counsel] he can move pro se because he indicated at some point that he would . . . rather represent himself. The [c]ourt advised him that that was not a good idea in light of the seriousness of what was going on today. And he has made a determination that he was going to proceed with [OPR counsel]. That's what . . . just . . . happened. So that the record is clear.
>
> DAG: Thank you. I just wanted the [c]ourt record on that issue.
>
> OPR COUNSEL: It is also my understanding that the [c]ourt will permit [K.K.] and I time for him to write down questions that I can read.
>
> THE COURT: If he wishes to do so. Yes.
>
> OPR COUNSEL: Thank you, Judge.

### III

K.K. argues in this appeal that Judge Francois denied him his constitutional and statutory rights to counsel. As the facts we have described at length show, K.K.'s claim is without merit. This court recently reviewed and

22

reaffirmed the basic principles underpinning a parent's right to counsel in cases brought by the Division:

> Parents in New Jersey charged with civil abuse and neglect under Title Nine or who are subject to Title Thirty termination proceedings have a constitutional right to counsel under the due process guarantees of Article I, paragraph 1 of the State Constitution, and a statutory right under N.J.S.A. 9:6-8.43(a), 9:6-8.30(a), and 30:4C-15.4(a).
>
> [New Jersey Div. of Child Prot. & Permanency v. A.O.J., ___ N.J. Super. ___, ___ (App. Div. 2020), (slip op. at 40) (quoting N.J. Div. of Child Prot. & Permanency v. G.S., 447 N.J. Super. 539, 555 (App. Div. 2016)).]

Our Supreme Court has also made clear, however, that a parent's right to self-representation in these Family Part proceedings "is by no means absolute." N.J. Div. of Child Prot. & Permanency v. R.L.M. (In re R.A.J.), 236 N.J. 123, 132 (2018).  A parent wishing to exercise this right of self-representation must do so in a manner

> that permits a full and fair adjudication of the dispute and a prompt and equitable permanency determination for the child. The parent must inform the court of his or her intention to appear pro se in a timely manner, so as to minimize delay of the proceedings. He or she must invoke the right of self-representation clearly and unequivocally. In the event of such an invocation, the court should conduct an inquiry "to ensure the parent understands the nature of the proceeding as well as the problems she may face if she chooses to represent herself."

[Ibid. (quoting In re Adoption of a Child by J.E.V. and
D.G.V., 226 N.J. 90, 114 (2016)).]

Here, the facts show with unmistakable clarity that K.K.'s invocation of his right to self-representation was made as a tactic to delay the court from conducting the fact-finding hearing.  Judge Francois took every reasonable measure to explain to K.K. what his legal options were under the circumstances. K.K. was duly represented by counsel assigned by the OPR.  The facts here speak for themselves.  K.K.'s aspersions of a conflict of interest by OPR counsel were baseless and properly rejected in a summary fashion by Judge Francois.

We are bound to uphold findings made by the judge if they are supported by "adequate, substantial, credible evidence."  N.J. Div. of Child Prot. and Permanency v. S.K., 456 N.J. Super. 245, 261 (App. Div. 2018) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).  Deference to a Family Part judge's decisions are appropriate because these jurists have "specialized knowledge and experience in matters involving parental relationships and the best interests of children."  N.J. Div. of Youth and Family Servs. v. F.M., 211 N.J. 420, 427 (2012).  We discern no legal basis to disturb Judge Francois's decision in this respect.

Finally, K.K. argues that we should reverse and vacate Judge Francois's findings that K.K. sexually abused his daughter Elyssa because the Division's

24

expert witness who examined the child referred to CSAAS during her testimony. The judge admitted Joanne Glaeser, a LCSW employed by the Audrey Hepburn Children's House, as an expert in the field of child psychology. The judge found Glaeser's "unrebutted testimony to be credible" and "very consistent with her written report." The judge found Glaeser's "clinical impressions supported a conclusion that [Elyssa] was sexually abused by her father and that she had been exposed to domestic violence, pornography and child maltreatment, all perpetrated by [K.K.]."

K.K.'s argument attacking Glaeser's testimony is predicated entirely on J.L.G., in which the Court held:

> Based on what is known today, it is no longer possible to conclude that CSAAS has a sufficiently reliable basis in science to be the subject of expert testimony. We find continued scientific support for only one aspect of the theory -- delayed disclosure -- because scientists generally accept that a significant percentage of children delay reporting sexual abuse.
>
> We therefore hold that expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials. Evidence about delayed disclosure can be presented if it satisfies all parts of the applicable evidence rule. See N.J.R.E. 702. In particular, the State must show that the evidence is beyond the understanding of the average juror.
>
> [234 N.J. at 272 (emphasis added).]

25

The Court published its decision in J.L.G. on July 31, 2018. Judge Francois released her decision in this case on June 26, 2017, more than a year before J.L.G. The clear language of the holding in J.L.G. limits its application to criminal cases. 234 N.J. at 272. In State v. G.E.P., we accorded the Court's holding in J.L.G. pipeline retroactivity and reversed four criminal convictions "because the admission of CSAAS expert testimony in these four cases calls into question the validity of each guilty verdict." 458 N.J. Super. 436, 443 (App. Div.), certif. granted, 239 N.J. 598 (2019).

However, we do not need to decide whether we should follow G.E.P. here and accord J.L.G. pipeline retroactivity. The plain language in J.L.G. indicates that expert testimony predicated on CSAAS "may no longer be admitted at criminal trials." 234 N.J. at 272. As an intermediate appellate court, we discern no basis to extend the Court's holding in J.L.G. beyond criminal trials. The remaining arguments raised by K.K. lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We affirm the Family Part's findings that the Division proved, by a preponderance of the evidence, that K.K. sexually abused his biological daughter Elyssa, as defined in N.J.S.A. 9:6-8.21c(3) and -8.21c(4), for the reasons expressed by Judge Francois in her well-reasoned memorandum of opinion dated June 26, 2017.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4485-17T3